### LEISER v. THOMAS et al.*
### No. 14489.

Court of Appeal of Louisiana. Orleans.

Nov. 13, 1933.

Rehearing refused.

Prowell, McBride & Ray, of New Orleans, and W. P. Mouton, of La Fayette, for appellant.

Eug. S. Hayford and Gordon Boswell, both of New Orleans, for appellees.

WESTERFIELD, Judge.

The majority of the court in this proceeding has recognized the right of a woman to recover from her adulterous paramour a substantial sum as damages for the very serious injuries she sustained on account of his negligent conduct. The only issue in the case (one of fact) is whether the defendant was under the influence of liquor at the time of the accident. If so, plaintiff was guilty of contributory negligence, and cannot recover for the reasons given in the case of Livaudais v. Black, 13 La. App. 345, 127 So. 129, where this court denied recovery upon this ground in an opinion written by the author of the opinion in the instant case.

There has been an overemphasis upon the sexual relations existing between the plaintiff and the defendant, and we feel that our late lamented brother, who tried this case below, in his conscious rectitude, was unwittingly affected by this fact, for he says that he believed the testimony of the defendant, plaintiff's paramour, and inferentially rejects the evidence of plaintiff. But he is inconsistent in this, because the defendant stoutly denies the charge that he was drunk, or under the influence of liquor. For our part we accept his statement at its face value, for it is in accord with other facts which are uncontroverted. In the first place, it must be borne in mind that the automobile ride which resulted in plaintiff's injury was not in any sense a joy ride. According to the evidence of both plaintiff and defendant, it was the means employed by the defendant in an effort to persuade the plaintiff to do something she did not want to do. The defendant, who was a part owner in a night club, was endeavoring to persuade the plaintiff to stay away from his club on a night when his wife was expected to be present, a request which seems very reasonable to us, but one which she was unwilling to grant. The unusual hour of the ride, 6 o'clock in the morning, would hardly have been selected for a frivolous purpose, and it must be conceded that the object which Thomas had in mind was serious enough. He was trying to prevent a meeting between his mistress and his wife, "a consummation devoutly to be wished."

The testimony is to the effect that almost one-fifth of a gallon of gin was consumed between 6 and 11 a. m., in the form of gin highballs, and that they drank an equal amount, or, as the trial judge put it, "drink for drink"; in other words, about 25 ounces of gin, or 12 ounces each. According to Webster's New International Dictionary of the English Language, gin is an alcoholic beverage containing 40 per cent. of alcohol by weight, and a highball is a drink of liquor diluted in a tall glass. The 25 ounces of gin contained 40 per cent. of alcohol, or 10 ounces, which was consumed in five hours by two persons, and, if taken at equal intervals, would amount to one ounce of alcohol an hour by each. It was diluted in a tall glass. We do not know the proportions, but, if a tall glass was used and an ounce of alcohol put in it, there must have been many times as much of water or of whatever liquid was used to dilute it. We have no means of ascertaining the potency of an ounce of alcohol taken in a highly diluted form once an hour for five hours. We do know that 3.2 per cent. beer is not intoxicating, for Congress has said so, and these "gin highballs" could not have been much stronger. If a few ounces of alcohol, copiously diluted, and taken at long intervals, can produce intoxication so profound that, seven hours after the first ounce and two hours after the last ounce is consumed, the consumer is

---

still under its influence, then everything that has been said concerning the baneful effect of the use of alcoholic beverages is richly de-served. But we cannot believe it could have such effect, whether introduced into the human system through the oral cavity, or subcutaneously by intravenous injection.

The fact that the plaintiff was the defendant's mistress has nothing to do with her right to recover. Her offense was a social sin, and it is written that "the wages of sin is death," social death, ostracism, and isolation. This has ever been the portion of all Magdalenes, a punishment so severe that the anguished soul of its victims. in humble contrition, cries aloud, "Pecavi! Pecavi!" But they do not suffer civil death, for it is the proudest boast of Anglo-Saxon civilization that all are alike before the law, the saint and the sinner, the vestal virgin and the scarlet woman: "Justitia nemini neganda est."

Rehearing refused.

JANVIER, Judge (dissenting).

Believing that the original decree was incorrect, and being unable to agree with the reasons given for refusing the rehearing, I respectfully dissent.